Arguments not to exceed 15 minutes per side. Mr. Gurwitz for appellate. Good afternoon. May it please the Court. Harold Gurwitz on behalf of Ibrahim Aoun. Before the for Mr. Aoun's convictions for offenses that come from initially his arrest at the time of a search at a house on Stahelin on the west side of Detroit in January of 2013. And then subsequently his arrest in March of 2013 at a house on Auburn that is based upon the January search by Detroit police. We have asked for this Court to reverse his conviction particularly on the charge of violating 18 U.S.C. section 924C for possessing a .38 caliber pistol which was found to be inoperable in one way or another by three different qualified examiners of firearms. This firearm was loaded? Yes sir it was. It had five bullets in it. Are there any cases where something was not deemed relevant either for this purpose or for furtherance or for possession where something was inoperable but nonetheless loaded? It just seems to me like you know you can talk about an inoperable weapon but people don't usually load them do they? There are no other facts in the record that explain why it was. The gun was found inside of a green bag. They might have thought it was usable if they put bullets in it. Yes. People don't put bullets in weapons that don't work do they? Well there's no evidence of that. I mean I don't use weapons. I don't know. Do they load weapons that are inoperable? I mean it seems kind of crazy. There's no indication of how long that weapon had bullets in it and who put it into that condition. According to the expert who I had examine the gun who was retired from the Michigan State Police, he said that in order to make this gun work it would be necessary to use two hands because the barrel. So it couldn't be readily accessible and used in the condition in which it was found in the house. I just want to get this straight. So it is the case that it was operable. I mean you had to use two hands but it was operable. It is the case. I want to make sure I understand your argument that yes it was operable but it was so difficult to operate and it was in these bags etc. that it really was not in connection with the trucks. That's correct your honor. There is a report prepared by an examiner from the Michigan State Police that checked off a little circle and it said inoperable next to it. That was that person's finding. Mr. Bailish who was the expert that the defense retained said that with a great deal of effort this particular pistol could be caused to actually pull the trigger back eventually and fire a bullet. The agent from the ATF who wrote a report after I examined the gun and questioned what was wrong with it said something similar to that. The issue though that we have presented is not whether the evidence was sufficient to support the jury's verdict. It's whether or not the judge erred by not allowing us to present any evidence concerning these things to expand upon this record that I established through proffers and submission of the agent's reports to present before the jury evidence that this gun if taken out of the bag and if it was in fact the gun that was associated with Mr. Aon could be used to further to promote a drug offense. Something could be used even if it's inoperable. You could say I've got a loaded weapon here, don't steal my drugs. There's nothing that says it has to be operable to be used in furtherance of, is there? No, no it isn't. But I think that the test that has been adopted by this court in Mackey is one that looks at factors. The Mackey case identifies a number of them and says that they're not exclusive. These are examples. Things about whether or not the gun was loaded is one of them. The circumstances in which it was found is another. And I think that in this situation being able to make that argument to the jury would have presented an opportunity to defend against this charge which was otherwise very, very difficult to defend against. It was only a matter of talking about the proximity of the weapon and whether or not Mr. Aon was there. The result of this obviously is very significant because there were two 924C charges and convictions. Mr. Aon was found guilty of each of those and sentenced, as the court was required to do, to a five-year sentence on one count and 25 on the other. So effectively Mr. Aon was sentenced then to 360 months, 30 years, based upon the events that occurred at the Stahelin House and the Auburn House. So my position is that the court's denial of our opportunity to present any evidence relating to these conditions, to call Mr. Bailish, who was present in the courthouse to testify, denied us of a substantial right and the error was therefore not harmless at all. It was found in the same bag with a large quantity of pills, is that right? It was. I would think any jury would say that even a realistic fake gun found in a bag with a large quantity of pills would be used in furtherance of the drug crime, wouldn't it? I mean, wouldn't the jury almost certainly find that? Why else would you have a realistic fake gun in your bag with pills? Well, I think, Your Honor, that that is a position. That's an extreme example, but it seems even there it would be. So if that's even, if you even hesitate as to how that should be answered, it seems clear that a jury is going to find a pistol that's loaded. Sure looks like a pistol if it actually is a pistol. Well, I'm sorry. And that's going to be used in furtherance of a drug crime. It's not like it was found upstairs and the drugs were downstairs. I didn't mean to hesitate. In the bag with the drugs, right? I'm sorry, Your Honor? Is that right? I thought you said it was found in the same bag as a large quantity of pills. There were a number of bottles with pills in the same bag, yes. I didn't mean to hesitate, though, because I think that the position that drug dealers use guns, and it's just a matter of course to defend their activities all the time, and, therefore, that there is the kind of relationship that must be found by the jury to exist to establish guilt for this violation was rejected by the court in Bailey. And there is a quote in the Mackey opinion that refers to the congressional history and says that expert testimony that drug dealers carry a firearm to protect themselves and their money may be insufficient to meet the in furtherance test. Certainly, just saying that's insufficient, but that isn't all they have. They have the pistol in the bag of pills, right? It's not just they're likely to have one. He has pills, so he's likely to have a gun somewhere. Certainly that's not enough. You've got to come up with a gun and say, you know, it wasn't in the next house. It wasn't, you know, locked in the basement. Maybe. Maybe. I mean, we have cases where there's all kinds of distance where we've said, well, yeah, but there were so much drugs in the house that it was probably in connection with or in furtherance of. But here you're talking about very close. There is no, the circumstances surrounding that, however, Your Honor, I think, don't provide any help to those kinds of facts. There is no evidence in the record at all of any drug dealing that took place at that house. There is no evidence of any activity at the house of any kind before the agents break in the front door and come inside. The testimony was they were there for the purpose of executing a search warrant. The testimony was the house looked like it was a functioning residence for someone. There were furnishings in the house. One of the exhibits showed a picture of photographs on the wall and food in the kitchen cabinets. There was just no evidence that anything had happened there except these people were found in the house at the time the warrant was executed. There were about five other people found in the downstairs of the house. They were given tickets for being in a premises without having proper identification. So in those circumstances, I think that it is possible to make a plausible argument to a jury, and I think that that's what I'm saying is the basis on which I was denied the opportunity to make a defense for him. The second and related issue concerns the conviction for maintaining this house under 856A1. Mr. Aoun was convicted of maintaining this house. The criteria that have been used by this court in Russell and the 11th Circuit in the Clavis case, which we have cited, look at factors such as control, duration, acquisition, renting or furnishing, repairing, supervising. None of those factors are present in these facts at all. I should mention, because I expect that my colleague from the U.S. Attorney's Office will, that there was a dog described as aggressive found in the basement. And I looked at Judge O'Meara's opinion from the district court, which said that the dog lived in the basement. I'm not sure where exactly that came from in the record. There was testimony that Mr. Aoun said that was his dog and he was allowed to take it outside where the police officer shot it. But there is no support in the record that Mr. Aoun lived there, that he provided any kind of assistance to... Which of the two houses are you talking about right now? This is the one, Your Honor, on Stahelen. The same house about which, where the bag with the gun was found. Same location. What about the other house? The other house, Your Honor, he was found in a bedroom. The officer testified that it looked like he was throwing a bag of marijuana outside the window and there was money in the bedroom. And that's all the evidence there to connect him to the activities. Is that pretty strong evidence or not? It's not evidence that shows that he was maintaining the house. He was present in a room. He had marijuana. They found money on the floor is essentially what it was. There was evidence... Was he also charged with aiding and abetting? He was. He was. And there was evidence of surveillance that took place for a couple hours with a multitude of visits to the house which were characterized as drug transactions. The Auburn house? This is the second house, Your Honor. Yes, on Auburn, Your Honor. Yes. I don't have anything further than what I've already said in my brief concerning the other two issues on the Bruton violation and the sentencing issue. I'd be happy to answer any other questions the court may have. So let's say that really the judge should have let in the evidence of operability or difficult to operate. What impact do you think it would even have had on the jury if they also knew that it was both loaded and that it was found in the bag with the pills? I mean, do you really think that it's plausible that they would have found that he didn't possess it in connection with drug activity? I think that given the description of the difficulty that anyone might have in attempting to actually use that gun, that there is a plausible argument that while there was a gun there, because there was no evidence that showed that it was ever presented to anyone or used in any fashion in any way at all, that a jury could reasonably conclude from that that this particular weapon wasn't really intended to be used to further this drug transaction. It's not a question of what was done with it because nothing was done with it except it was in a bag that was found in a storage place in the attic. Right, but all of those arguments could be made. Yes, yes. I think that given all these other circumstances, that there was no other, that the connections of Mr. Aoun to this premises were so limited that there is a basis on which this evidence was relevant and could have provided a plausible argument to the jury. And I think given the significance of the outcome in this case, that it was based upon that, that Mr. Aoun was sentenced to an extra 25 years, that it is significant. Thank you, Mr. Earwitz. Thank you. May it please the Court, Stephanie Gorgon for the United States. I'd like to start with whether there were facts in the record to explain why the gun was loaded. Because my colleague said that there weren't, but there were facts. There were the facts that my colleague proffered to the District Court. In 916 of the record, he said that his own expert would testify that it was workable, albeit with two hands. And then in 768 of the record, the ATF expert that the government didn't call since this was decided to be not relevant to the case, would have testified that he had actually test fired this weapon, and that it was actually just not with two hands, but that it required some warming up. So there was some reason to explain why this gun was loaded. But I want to get to one of your points, Judge White, which is, let's assume that it was evidentiary error because the threshold for relevance is pretty low, and if it was even tricky to fire, maybe the jury should have been able to hear that. And I think under the facts of this case, my colleague just cannot show that he was prejudiced by the failure of the Court to allow this piece of evidence to come before the jury. You weren't the trial lawyer, right? No, I wasn't. I mean, it's just a reaction. It's like, why fight over evidence like that? I mean, it's relevant. If you ask me, it's relevant. Sure. Is it great evidence? No. Would it have made a difference? Probably not. So why create these problems by arguing against evidence that probably is relevant? I actually can, I think, answer that question based on the record. This came up kind of late. It came up on the third day of trial, and the way it came up was that my colleague said, I want to introduce this evidence to show that it's not a firearm, right? So he wanted to initially, he told the district court and the trial attorneys, I want to show that this was not operable and so it wasn't a firearm and that it specifically negates counts 3 and 4, 3 being the felon possession charge and 4 being this 924C. And so the government said, well, we disagree, citing Yannet, which is very clear, it's not relevant, it's not an element. And the court didn't make a decision that day. The government had anticipated finishing its case that day, actually bled over into the next day, and that's when the district court took it back up again and said, no, you can't introduce it, it's not relevant. And then my colleague's explanation for its relevance kind of got a little sharper. He said, this is actually relevant also for count 4 in terms of can it further or did it further the drug crime. And there, Your Honor, I can't really, that's where the record kind of stops. We don't really know why. The government didn't come in with a good rebuttal. It didn't come in with an explanation at all. It was late, though, and the court had already ruled and then the court said, well, I've made my decision and things moved on. So that's why we're treating it as preserved, but it was kind of late in the game. And so it's not a case where like this was briefed and we fought hard against it. I think if we had thought through, we would have come to the same conclusion. But here we can see that every single Mackey factor, including the most important, which is the strategic location of the gun, cuts against the defendant. And furthermore, Judge Rogers made this point, and I'd like to address it a little more fully. A gun could be inoperable, and here we don't have an inoperable gun, but a gun could be inoperable and still promote a drug crime. And what I was able to provide in the briefing was a CF site to a Supreme Court case called McLaughlin, which dealt with not an inoperable gun but an unloaded gun, which could be used either to intimidate and instill fear or as a bludgeon to commit an assault with a deadly weapon. Now, in the course of preparing for this argument today, I found one other case that I think is even more helpful to the court, so I'd like to provide that now. It's from the Seventh Circuit. It's called Castillo, 406 F. 3rd, 817 Note 3. It's a 10-year-old case, so I don't have it. Back up. You've gone a little fast for me. I'm sorry, Your Honor. 406 F. 3rd. And it's at page 817, footnote 3. And there the court said exactly what Judge Rogers just said, which is that even a gun that does not fire can promote a drug crime. So that's a little more on point, and I apologize for not finding that sooner in the briefing. So here, Your Honors, I'd like to turn now to the... Could you address the Auburn House, maintaining the Auburn House? Sure. I want to first kind of talk about what it means to maintain because I was, in the course of preparing, I was reading some cases from other circuits, and the First Circuit acknowledged that maintain and use, use or maintain a drug house, these terms can be a little protean. This court's provided some guidance in Russell, saying that evidence of maintenance includes evidence of control, supervision, or protecting. And that's from Russell. So here, when we go to the Auburn House, there's no mere presence here, as my colleague claims. This is a vacant house. We know that from the record. There's no refrigerator. There's no utilities. There are seven men in the house. And from 10.30 p.m. to 1 o'clock in the morning, 68 drug deals take place out of this house. And of those seven men who are found in this house, only the defendant and his associate, Acolfi, have control over the drug money from all those deals. And so here, I would argue that we have supervision and control, and a jury could rationally infer supervision and control over that drug house because of the only two men of the seven men who have custody, command, and control over the money. The jury also heard about some other acts from Forer House and the Montrose House. And you can see in the closing argument in this case, this is on pages 1065 through 67, the prosecutor explained that these showed the intent of the defendant and his associate, Acolfi, to use less-than-stellar homes, I think was the term that the prosecutor used because these were essentially vacant, abandoned homes, in the Warrendale neighborhood of Detroit to deal drugs, to use them as drug premises, and that the beauty of this scheme was that by doing this, they could avoid culpability using locations with no legal connection to them. So you can see that this is how this evidence was used. You can see it from the closing argument. And that shows supervision and control. Going back to the Stahelin House, that's the January... Wait, I'm sorry. What is it that shows that he had supervision and control as opposed to was one of the people that was hanging out there or selling drugs there just because he had some money in his pocket? Yeah, he had $962, and of all the men, he and Acolfi were the only two that had any money. So that's the crucial fact. I think so, Your Honor. That plus the other acts of evidence which helps on the intent to maintain that kind of supervision and control of the house because this was part of the MO. It's another vacant house in Warrendale, which is a neighborhood in Detroit. I know you know. And, again, using the vacant houses in order to kind of have this problem here. But what if there were other people there too? Just because a group of people goes around using these vacant houses, does that mean that each one of them are maintaining the house? No. You would want to show, for example, I don't know what all the seven men were doing there. Some of them were probably customers. Maybe some of them were helping out with the drug dealing. But what you want to look for is evidence that you can give to the jury of control or supervision or protection. And here, Acolfi's got the bag full of guns. That's the protection. Acolfi and the defendant have the money. That's the supervision and the control. And by Acolfi having the guns, you're saying he helped Acolfi and Acolfi was maintaining. He was also maintaining. Correct, Your Honor. And that aiding and abetting theory of liability for the Auburn house that we're talking about now, that was pretty explicit in the trial of the prosecutor in his closing argument. That's how he argued it to the jury. And you got that from the fact that he kind of came back in through the window? Yeah. The guy who came back through the window was the guy with the bag full of guns. That was the co-defendant. This defendant was also at the window tossing a bag full of marijuana out to try to get it out of the house, and he was the one who was shoving $962 in a hole in the wall to kind of distance himself from it. Going back to Stahelin, I think the evidence is perhaps even stronger because he has a dog in the basement guarding it. He's on the first floor with that green bag with the .38 and the pills. It's over 500 Vicodin pills. He races up to the second floor. He knows where to put it in a crawl space on the second floor. What kind of dog is this? It's an aggressive pit bull, according to the record. Oh, my God. That was how it was described. As far as my colleague did mention, well, it was in the basement, so that somehow means that it couldn't have been used for protection. But obviously the dog could have been brought out of the basement at any time, and this court's reasoning in Russell, one of the cases cited in the briefing, found that a vehicle that was in the yard had been parked in such a way that it was kind of halfway through a fence in the yard, and the trunk was facing the house and was full of weapons, that those weapons in that layout was evidence of protecting that home. And so I fail to see how the pit bull in the basement of the home is any more kind of removed or is any less accessible than those guns in that trunk from Russell. So given that the jury heard all of this and that this evidence is supposed to be taken in the light and most favorable to the government, it's hard to see how this falls below that kind of bare rationality threshold articulated by the Supreme Court. Okay. Thank you. All right. Thank you, Your Honors. On the other issues, I'm going to rest my briefs, and I ask that you affirm. Thank you very much. First, the arguments were made to the court on March 4. It's Volume 4 of the transcript. Page ID numbers 1400 through at least 1402, and on March 5 at record numbers 915 and 916. And what I argued to Judge O'Meara at that time, first of all on the first day, was that the operability of the gun was a fact question that needed to be decided by the jury. And on the 5th, when the judge had denied my request to admit this, I asked for an opportunity to make a proffer of exactly what the evidence would be, and I told the judge that Agent Awe would say that if the cylinder was in the firing position before the hammer was pulled back, that he could not depress the trigger. That was one aspect of what he had to say. So I would submit that this was presented to the judge as a question of admissibility. A second point is that the McLaughlin case from the Supreme Court is one in which the defendant was charged with armed bank robbery. The opinion by Justice Stevens is two short paragraphs. It just says that it is a dangerous weapon for the purpose of 18 U.S.C. Section 2113. Different statute, different issue. Third point I'd like to make is that there was reference, there was testimony in the middle of the trial under Section 404B, Rule 404B, similar acts concerning two other houses in which Mr. Aoun was found by the police to be in what they thought were drug houses. They found drugs, but in neither case did they find Mr. Aoun in possession of the firearm. So the evidence of the case the government presented didn't show a pattern of behavior of Mr. Aoun having a gun for protection. That's something that the jury had to consider. And finally, with respect to the dog in the basement, the record is also clear that the basement door was closed and I don't think that having a dog in a basement of a house is the way anybody goes about protecting drugs up in the second floor or in the first floor. And that it just wasn't consistent. It's aggressive enough you might not want him around. Yeah, you might want to wait until you have to open the door and let him out. Well, that could be, Your Honor. I just don't think that it's very compelling evidence that... Well, let's put it this way. It wasn't a poodle. Well, that's true. That's true. But I think pit bulls get a bad rap. And just by their name doesn't mean that they're necessarily vicious guard dogs. And that's all the evidence was, is that it was a pit bull who was aggressive. Thank you very much. I don't want to be unfair. Thank you, Mr. Gibbs. The case will be submitted.